

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MARVIN D. PUTZIER, HOMETOWN HARDWARE, INC. d/b/a HOMETOWN ACE HARDWARE, DON WEST, MIDLOTHIAN HOME CENTER, INC. d/b/a/ ACE HARDWARE, DOUGLAS LORENZ, and FOUR ACES, LLC d/b/a ACE HARDWARE OF ARVADA, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | No. 13 C 2849 <br><br> Chief Judge Rubén Castillo |
| Plaintiffs, <br> v. | ) ) ) | |
| ACE HARDWARE CORPORATION, | ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Marvin D. Putzier, Hometown Hardware, Inc. d/b/a/ Hometown Ace Hardware ("Hometown Ace"), Don West, Midlothian Home Center, Inc. d/b/a/ Ace Hardware ("Midlothian Ace"), Douglas Lorenz, and Four Aces, LLC d/b/a/ Ace Hardware of Arvada ("Arvada Ace"), bring this purported class action in fraud against Defendant Ace Hardware Corporation ("Ace"). Plaintiffs allege common law fraud, fraudulent inducement, and statutory fraud in violation of the Illinois Franchise Disclosure Act ("IFDA"), 815 Ill. Comp. Stat. 705/1 *et seq.* Presently before the Court is Ace's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and failure to plead with the specificity required by Federal Rule of Civil Procedure 9(b). For the reasons stated below, Ace's motion is granted.

## RELEVANT FACTS

Ace is a Delaware corporation in the business of selling wholesale hardware products and retail hardware franchises. (R. 21, Corrected Am. Compl. ¶ 16.) Ace's principal place of business is in Oak Brook, Illinois. (*Id.*) Over 4,000 Ace-franchised hardware stores currently exist in the United States. (*Id.* ¶ 17.) Putzier, West, and Lorenz (collectively, the "Franchisees"), through their respective corporations, entered into franchise agreements with Ace to open and operate Ace franchise stores. (*Id.* ¶¶ 10-15.) Putzier is a citizen and resident of Washington and the president of Hometown Ace, a Washington corporation. (*Id.* ¶¶ 10-11.) In 2006, Hometown Ace entered into a franchise agreement with Ace to open a "Vision 21" Ace franchise. (*Id.* ¶ 11.) West is a citizen and resident of Texas and the president of Midlothian Ace, a Texas corporation. (*Id.* ¶¶ 12-13.) In 2002, Midlothian Ace entered into a franchise agreement with Ace to operate a "Vision 21" Ace franchise. (*Id.* ¶ 13.) Lorenz is a citizen and resident of Colorado and the managing member of Four Aces, a Colorado limited liability company. (*Id.* ¶¶14-15.) In 2005, Four Aces entered into a franchise agreement with Ace to operate a "Vision 21" Ace franchise. (*Id.* ¶ 15.)

Under the franchise agreements, each Franchisee agreed to operate his store under Ace's Vision 21 franchise plan. (*Id.* ¶ 1.) Ace created its Vision 21 plan in 2000 as a new business model for some of its larger franchise stores. (*Id.* ¶¶ 1, 19.) Ace implemented the Vision 21 strategy to improve retail success of these stores and better compete with "big box" home improvement companies like Home Depot or Lowe's. (*Id.* ¶ 20.) Under the Vision 21 plan, Ace prescribed certain inventory, merchandising, fixtures, signage, décor, and other miscellaneous purchases for its franchises, which required substantial start-up investments from each Franchisee in preparation to open his store. (*Id.* ¶¶ 30, 49, 65.)

Each Franchisee alleges that after he contacted Ace about franchising opportunities, Ace provided financial information and sales forecasts for a new store in a proposed location, as well a Uniform Franchise Offering Circular ("UFOC"), a document containing historical data about the performance of existing Ace stores.[1] (*Id.* ¶¶ 2, 25-26, 46, 62.) Plaintiffs assert that this factual information was misleading because, although Ace claimed that the historical figures represented averages of all stores that reported their financial performance to Ace, the figures were actually averages of only the relatively successful stores. (*Id.* ¶¶ 2, 27, 47, 63.) Plaintiffs assert that Ace cherry-picked the stores it included in its averages in order to make Ace franchises more appealing to potential franchisees. (*Id.* ¶¶ 79.)

Ace also provided each Franchisee with a draft "pro forma" document containing forecasts of profitability, sales, and cash flow specific to a new Ace store at the proposed location. (*Id.* ¶¶ 28, 48, 64.) Ace represented to each Franchisee that it derived these pro forma forecasts from the historical performance data of existing franchise stores. (*Id.* ¶ 3.) Ace stated that it could predict the future performance of new or converted Vision 21 stores with over 90% accuracy by applying a "tried and true" method of deriving future projections to historical performance data. (*Id.*) Through these individualized pro forma documents, Ace represented that each Franchisee's own Vision 21 store would be "sustainably profitable" and would generate positive cash flow within the first few years of operation. (*Id.* ¶¶ 28, 48, 64.) Based on the pro formas and forecasts Ace provided, each Franchisee believed his Vision 21 Ace franchise would be successful. (*Id.* ¶¶ 29, 48, 64.) After investing significantly to open their Ace franchise stores, however, none of the Franchisees' stores ever approached the forecasted sales

---

[1] After 2007, these documents were called Franchise Disclosure Documents. (R. 21, Am. Compl. ¶ 2.)

or projected revenue. (*Id.* ¶ 5.) Like many other Vision 21 stores, the Franchisees' stores are each failing or have already closed. (*Id.*)

After investing $315,000.00 of his own money and obtaining a small business loan in excess of $600,000.00, Putzier opened Hometown Ace in Milton, Washington in April 2007. (*Id.* ¶¶ 25, 30, 33.) The pro forma documents Ace gave him in 2006 predicted that Hometown Ace would have more than $1 million of sales in its first year and more than $1.5 million in its second year. (*Id.* ¶ 28.) In fact, Hometown Ace made less than 60% of its projected sales in the first year and less than 50% of its projected sales each year since then. (*Id.* ¶ 40.)

In August 2002, West opened Midlothian Ace in Midlothian, Texas. (*Id.* ¶¶ 44, 51.) West invested $300,000.00 of his own money to cover the start-up costs and an additional $300,000.00 through his real estate business to build the store from the ground up. (*Id.* ¶ 49.) The pro forma documents Ace gave West represented that he would recapture his initial cash investment within the first three to five years of owning his store. (*Id.* ¶ 50.) In the first year of operation, Midlothian Ace made less than 70% of its projected sales. (*Id.* ¶ 58.) The franchise closed its doors and West sold the store "at a significant loss" in 2008. (*Id.* ¶ 59.)

In March 2005, Lorenz opened Arvada Ace in Arvada, Colorado after investing $300,000.00 of his own money and $300,000.00 he borrowed from family members. (*Id.* ¶¶ 65, 68.) In the pro forma documents it gave to Lorenz, Ace represented that Arvada Ace would make around $1 million in sales in its first year. (*Id.* ¶ 75.) Plaintiffs allege, however, that Arvada Ace has lost an average of $100,000.00 a year every year since it opened. (*Id.*)

Plaintiffs allege that the Franchisees were successful entrepreneurs whose stores failed despite their best efforts. (*Id.* ¶¶ 21, 41, 43, 44, 52, 59, 60, 69.) Plaintiffs allege that Ace manipulated the UFOC figures and pro forma data to show attractive projections rather than

reasonable ones. (*Id.* ¶ 83.) Plaintiffs allege that Ace inflated variable numbers, such as projected sales, to compensate for the occupancy costs of Vision 21 stores, which were significantly higher than the occupancy costs of other franchises. (*Id.* ¶¶ 38, 56, 73, 82.) Plaintiffs allege that reasonable sales projections would not have been manipulated to compensate for the high occupancy costs and would have projected an "unacceptable cash flow." (*Id.* ¶¶ 39, 57, 74.) Plaintiffs contend that, based on Ace's omissions and misrepresentations, the Franchisees entered into franchise agreements for stores that were "destined to fail." (*E.g.*, *id.* ¶ 45.) Plaintiffs further allege that Ace intentionally concealed accurate data and plausible financial projections and instead provided false projections based on manipulated data in order to entice the Franchisees to make substantial investments in franchising. (*Id.* ¶¶ 83, 85.) Due to this concealment, Plaintiffs allege that the Franchisees did not become aware of Ace's conduct until the spring of 2011. (*Id.* ¶ 87.)

## PROCEDURAL HISTORY

This putative class action was originally filed in the Southern District of Florida on January 6, 2012. (R. 1, Compl.) The initial complaint was brought on behalf of the proposed class by Advanced Caregivers LLC, a Florida limited liability company d/b/a Hialeah Ace Hardware, and William Bloodworth, the chief executive officer of Advanced Caregivers. (*Id.*) On March 1, 2012, Ace filed a motion to compel arbitration in the Northern District of Illinois, contending that the parties' written agreements required arbitration in Chicago, Illinois. *Ace Hardware Corp. v. Advanced Caregivers, LLC*, No. 12 C 1479. Ace alleged that it began including arbitration in its franchise agreements in March 2009. *See Ace Hardware Corp. v. Advanced Caregivers, LLC*, No. 1:12-CV-01479, 2012 WL 5197942, at *2 (N.D. Ill. Oct. 18, 2012). After extensive briefing, Judge Darrah concluded that the franchise agreement between

Ace and Advanced Caregivers contained a valid arbitration provision, and he granted Ace's motion to compel arbitration on October 18, 2012. *Id.* at *6.

The district court in Florida stayed the instant case pending the arbitrability ruling. (R. 14, Order.) Upon Judge Darrah's ruling, Advanced Caregivers and Bloodworth moved the district court in Florida to reopen this case and allow them to file an amended complaint naming new class representatives whose franchise agreements did not include arbitration provisions. (R. 16, Mot. Reopen.) The case was reopened, (R. 17, Order), and an amended complaint was filed that named the instant Plaintiffs as class representatives, (R. 21, Corrected Am. Compl.). In Count I, Plaintiffs allege that Ace committed fraud in connection with its offer and sale of Ace franchise stores in violation of the IFDA. (R. 21, Corrected Am. Compl. ¶¶ 95-103.) In Count II, Plaintiffs allege that Ace fraudulently induced them to purchase franchises. (*Id.* ¶¶ 104-09.) In Count III, Plaintiffs allege that Ace committed fraud by knowingly inflating sales projections and providing false historic performance numbers to the Franchisees. (*Id.* ¶¶ 110-15.) Plaintiffs further allege that Ace fraudulently concealed its conduct in connection with each count of fraud. (*Id.* ¶¶ 79-87.)

On January 31, 2013, Ace moved the Florida district court to transfer venue to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a). (R. 24, Mot. Transfer.) After a hearing, Ace's motion was granted on April 12, 2013, and this case was transferred to the Northern District of Illinois and assigned to this Court on April 16, 2013. (R. 40, Order.) On May 8, 2013, Plaintiffs filed a motion for class certification, (R. 47, Pls.' Mot. Class Cert.); that motion remains undecided pending the disposition of Ace's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), which was filed on May 21, 2013, (R. 55, Def.'s Mot.), and is presently before the Court.

## LEGAL STANDARDS

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). On a motion under Rule 12(b)(6), the Court construes the complaint in the light most favorable to the plaintiff, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in the plaintiff's favor. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010). Pursuant to Rule 8(a)(2), a complaint must contain "a 'short and plain statement of the claim showing that the pleader is entitled to relief,' sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2); *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 555 (2007)).

While liberal notice pleading under Rule 8(a) is sufficient for most complaints, Rule 9(b) imposes heightened requirements for actions in fraud. Fed. R. Civ. P. 9(b). A well-pleaded complaint alleging fraud must state "with particularity the circumstances constituting fraud." *Id.* Essentially, the plaintiffs must plead the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). A plaintiff claiming fraud must do sufficient pre-complaint investigation "to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). Greater precomplaint investigation and heightened pleading is warranted in fraud cases "because fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it," *id.*, and "because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled," *Pirelli Armstrong Tire*

*Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011). Fraud claims based on state law, including those brought under the IFDA, are subject to the heightened pleading standard of Rule 9(b) when brought in federal court. *Ackerman*, 172 F.3d at 470 ("Rule 9(b) requires heightened pleading of fraud claims in all civil cases brought in the federal courts, whether or not the applicable state or federal law requires a higher standard of proving fraud"); *see Hengel, Inc. v. Hot 'N Now, Inc.*, 825 F. Supp. 1311, 1321 (N.D. Ill. 1993) (dismissing an IFDA fraud claim for failure to plead with the specificity required by Rule 9(b)).

When ruling on a motion to dismiss, courts are typically limited to considering matters within the four corners of the complaint. *See* Fed. R. Civ. P. 12(d); *see also Tierney v. Vahle*, 304 F.3d 734, 738-39 (7th Cir. 2002). The general rule provides that when evidence is attached to a motion to dismiss, the court must either convert the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment or exclude the documents and continue under Rule 12. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)). Limited exceptions exist, however, for "documents that are critical to the complaint and referred to in it." *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (citing Fed. R. Civ. P. 10(c)). Such documents attached by a defendant to his motion to dismiss are considered part of the pleadings and may be considered by a district court without converting the motion into a motion for summary judgment. *Id.*

Here, some of the documents Ace attached to its motion to dismiss—the Ace Hardware Corporation Franchise Offering Circular for fiscal years 2003, 2004, and 2005, (R. 56-1, Ex. A), and Plaintiffs' Ace Hardware Membership Agreements, (R. 56-1, Exs. B, C, D)—are properly considered part of the pleadings. Although Plaintiffs did not attach any documents to their complaint, Plaintiffs incorporated the Franchise Offering Circulars and their Membership

Agreements by repeated reference to the documents. (*E.g.*, R. 21, Corrected Am. Compl. ¶¶ 2, 4, 11, 13, 15, 26, 42, 46, 62, 78.) The contents of the Franchise Offering Circular and the Membership Agreements, and the circumstances surrounding their inception, are central to Plaintiffs' claims. The Court concludes that Plaintiffs incorporated these documents by reference, and the Court will consider them in ruling on Ace's motion to dismiss.

## ANALYSIS

Ace asserts four reasons that the complaint should be dismissed: (1) Plaintiffs' claims are time-barred; (2) Lorenz and Arvada Ace lack standing to bring this action; (3) Plaintiffs' allegations fail to state a claim; and (4) even if they state a claim under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs fail to plead their fraud claims with the particularity required by Federal Rule of Civil Procedure 9(b). (R. 55, Def.'s Mot. ¶¶ 2-7.)

## I.     Choice of Laws Analysis

As an initial matter, the parties dispute which state's laws apply to Plaintiffs' common law fraud and fraudulent concealment claims. (R. 56, Def.'s Mem. at 13-14; R. 57, Pls.' Resp. at 3-5.) The Court must thus determine which state's laws govern this action.

The parties agree that the Court must apply Florida choice of law rules to resolve the dispute. (R. 56, Def.'s Mem. at 13; R. 57, Pls.' Resp. at 3.) This case was initially filed in the Southern District of Florida and was transferred to the Northern District of Illinois for convenience under section 1404(a) of the Judicial Code. (R. 40, Order.) A transferee court hearing a case on grounds of convenience must apply the choice of laws rule of the transferor jurisdiction. *See Barron v. Ford Motor Co. of Can. Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992) (citing *Ferens v. John Deere Co.*, 494 U.S. 516 (1990)). Additionally, "a federal district court sitting in diversity must apply the choice of law rules of the forum state." *Trumpet Vine Invs.,*

*N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115 (11th Cir. 1996) (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Thus, Florida's choice of law rules govern here.

Florida law applies different choice of law rules to different areas of law. *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006). Thus, the first step in a choice of law analysis under Florida law "is to determine the nature of the legal issue involved." *Crowell v. Clay Hyder Trucking Lines, Inc.*, 700 So. 2d 120, 122 (Fla. Dist. Ct. App. 1997) (citing *Beattey v. Coll. Ctr. of Finger Lakes Inc.*, 613 So. 2d 52, 53 (Fla. Dist. Ct. App. 1992)). Here, Plaintiffs' claims arise under tort law because they allege common law fraud and fraudulent inducement. *See Tonkovich v. S. Fla. Citrus Indus., Inc.*, 185 So. 2d 710, 712 (Fla. Dist. Ct. App. 1966).

The second step in the analysis is to determine and apply the forum's choice of law rules. *Beattey*, 613 So. 2d at 53. With respect to torts and statutes of limitations, Florida courts utilize the "significant relationships test" set forth in the Restatement (Second) of Conflict of Laws, which is a "flexible test to determine which state has the most significant relationships to the cause of action." *State Farm*, 945 So. 2d at 1163; *see Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). Ace argues that under this test, the laws of the states in which the stores were located—Washington, Texas, and Colorado—govern Plaintiffs' claims of common law fraud and fraudulent inducement. (R. 56, Def.'s Mem. at 14.) Plaintiffs argue that Illinois law applies because Ace's principal place of business is in Illinois, its projections and performance data are prepared in Illinois, and "the fraudulent scheme Ace hatched began in and emanated from Illinois." (R. 57, Pls.' Resp. at 3-4.)

With regards to torts based in fraud, the significant relationships test states that when the plaintiff's reliance and the false representations occurred in the same state, the law of that state should usually be applied. Restatement (Second) of Conflict of Laws § 148(1) (1971). Here, the facts suggest that Ace may have made some of its allegedly fraudulent statements at its headquarters in Illinois, but it also made many within the state of each Franchisee. (*See* R. 21, Corrected Am. Compl. ¶¶ 2, 3.) Because more than one state is implicated under the facts alleged, the Court cannot conclude that all of Plaintiffs' actions in reliance took place in the same state where Ace's false representations were made and received. "When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made," the court should consider the following contacts to determine which state has the most significant relationship to the case:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2) (1971).

The first contact the Court considers is the state where Plaintiffs acted in reliance upon Ace's fraudulent misrepresentations. *Id.* An action in reliance can occur when the plaintiff relinquishes assets to or enters into a contract with the defendant or a third person. Restatement (Second) of Conflict of Laws § 148 cmt. f (1971). This contact is given more weight when the plaintiff's action in reliance is taken pursuant to terms of an agreement between the plaintiff and the defendant. *Id.* Here, Plaintiffs' actions in reliance were their expenditures of substantial

personal savings, retirement funds, or bank loans as necessary start-up costs to open their stores at the express locations stipulated by contract. (R. 21, Corrected Am. Compl. ¶¶ 30-32, 49-50, 65-67.) These expenditures were made pursuant to the franchise agreements and occurred in the state where each Franchisee's store was located. (*See id.* ¶¶ 30, 49, 65.) The Court thus affords significant weight to the parties' contacts with Washington, Texas, and Colorado.

The second contact, the place where Plaintiffs received Ace's representations, falls similarly in favor of these three states. Restatement (Second) of Conflict of Laws § 148(2)(b) (1971). Plaintiffs assert that Ace provided them with franchise information and sales forecasts, (R. 21, Corrected Am. Compl. ¶¶ 25, 46, 62), and sent representatives in person to discuss the particulars of opening an Ace store, (*id.* ¶¶ 22, 48). These contacts were made at the Franchisees' places of residence and at the proposed locations for the new franchise stores in Washington, Texas, and Colorado.

The third contact, the place where Ace made the representations, is less straightforward because Plaintiffs allege that Ace made statements in Illinois as well as in their respective home states. (R. 21, Am. Compl. ¶¶ 23, 48, 61.) Under the Restatement, "[w]hen a major part of the representations is made in one state and a lesser part in another, the first state has a more important contact with the occurrence than does the latter." Restatement (Second) of Conflict of Laws § 148 cmt. h (1971). In *Trumpet Vine Investments, N.V. v. Union Capital Partners I*, for example, the Eleventh Circuit gave substantial weight to New York, the place where alleged fraudulent misrepresentations "primarily occurred." 92 F.3d at 1118 (applying section 148 of the Restatement to conduct a conflict-of-laws analysis under Florida law for a fraud claim). Although the defendants made subsequent misrepresentations in other states, the court discounted the later contacts because they "arose from the initial acts in New York." *Id.*

Here, Plaintiffs base their claims in part on fraudulent information received as part of Ace's alleged "uniform policy and practice," (R. 21, Corrected Am. Compl. ¶ 2), developed by Ace's headquarters in Oak Brook, Illinois, (*id.* ¶ 16; R. 57, Pls.' Resp. at 4). Plaintiffs also assert that Ace's misrepresentations took the form of direct communications in the states where each Franchisee was located. (R. 21, Corrected Am. Compl. ¶¶ 23, 48, 61). Illinois, the initial place of contact, thus appears to have a more primary connection to Ace's misrepresentations. The Restatement instructs, however, that the place of the defendant's false representations is a more important contact when the representations were made only in one state than when they were made in two or more. Restatement (Second) of Conflict of Laws § 148 cmt. h (1971). Taking these policies into consideration, the Court gives Illinois its appropriate weight as the primary contact state of Ace's representations.

Under the fourth contact, the domicil or place of incorporation of the parties, no single state appears to present a most significant relationship. Ace is incorporated in Illinois, and the Plaintiffs are domiciled and incorporated in their home states of Washington, Texas, and Colorado. (R. 21, Corrected Am. Compl. ¶¶ 10-16.) But in a case such as this, where Plaintiffs' losses are pecuniary, the state of the plaintiff's principal place of business is considered more significant. Restatement (Second) of Conflict of Laws § 148 cmt. i (1971). "[A] financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship." *Id.* The Court accordingly gives Plaintiffs' contacts in Washington, Texas, and Colorado greater weight.

The last two contacts the Court considers also govern towards applying the laws of Plaintiffs' home states. The "tangible subject" of each franchise agreement—each franchise store—was located in the state where each Plaintiff agreed to develop a franchise. (R. 21,

Corrected Am. Compl. ¶¶ 10-15.) Similarly, Plaintiffs were expected to render performance of their franchise agreements in the state in which each store was located. (*Id.*) These contacts are also given their appropriate weight.

Pursuant to the criteria set forth in the Restatement, the Court finds that the states in which Plaintiffs' franchise stores were located—Washington, Texas, and Colorado—present the most significant relationship to this case. This outcome is compatible with the "general approach" announced by Restatement comment j: "If any two of the above-mentioned contacts, apart from the defendant's . . . state of incorporation . . . are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues." Restatement (Second) of Conflict of Laws § 148 cmt. j (1971).

Similar results have been reached in other cases applying Florida law. In *Berry v. Budget Rent a Car*, the Southern District of Florida conducted the same "most significant relationship" test in an action for fraud. 497 F. Supp. 2d 1361, 1365-66 (applying Florida law). The defendant was headquartered in New Jersey, but the plaintiffs experienced their injuries separately in the states of Florida and North Carolina. *Id.* Even though the "alleged fraudulent scheme" was said to emanate from the defendant's headquarters in New Jersey, the Florida conflicts principles dictated that Florida and North Carolina presented more significant relationships to the claim. *Id.* at 1366. The defendant's headquarters was only one contact, while the alleged misrepresentations, the plaintiffs' acts in reliance, the plaintiffs' performance of their contracts, the plaintiffs' domiciles, and the tangible subject of the transactions were all in Florida and North Carolina. *Id.* The court thus ruled that Florida and North Carolina law would apply. *Id.*

Here, for the reasons set forth above, the Court finds that Plaintiffs' home states have the most significant relationship with this case, and the Court will apply the laws of Washington, Texas, and Colorado to Plaintiffs' claims of common law fraud and fraudulent inducement.

## II.     Timeliness of Plaintiffs' IFDA Claims

Before turning to Plaintiffs' common law claims in Counts II and III, however, the Court addresses Plaintiff's IFDA claim in Count I. Ace contends that Plaintiffs' fraud claims under the IFDA are time-barred under the statutory limitations period. (R. 56, Def.'s Mem. at 10-11.) Section 27 of the IFDA sets forth the limitations period and provides in relevant part as follows:

> No action shall be maintained under Section 26 of this Act to enforce any liability created by this Act unless brought before the expiration of 3 years after the act or transaction constituting the violation upon which it is based, the expiration of one year after the franchisee becomes aware of facts or circumstances reasonably indicating that he may have a claim for relief in respect to conduct governed by this Act, or 90 days after delivery to the franchisee of a written notice disclosing the violation, whichever shall first expire . . .

815 Ill. Comp. Stat. 705/27. The parties dispute whether the three-year or the one-year period applies. (R. 56, Def.'s Mem. at 10; R. 57 Pls.' Resp. at 18-19.) Accepting as true Plaintiffs' allegation that they did not become aware of the facts that give rise to their IFDA claims until "spring 2011," (R. 21, Corrected Am. Compl. ¶ 87), the one-year limitations period provided by statute expired at an unspecified time in spring 2012. The three-year repose period, by contrast, expired three years after the alleged fraudulent transactions upon which the claims are based and thus varies for each Franchisee.

As discussed above, Plaintiffs bring this suit under section 6 of the IFDA, which concerns fraudulent practices "[i]n connection with the offer or sale of any franchise." 815 Ill. Comp. Stat. 705/6. Thus, the pertinent "act[s] or transaction[s] constituting the violation[s]" upon which Plaintiffs' IFDA claims are based are the sales or offers of the franchises. *See, e.g., Dudley*

*Enters., Inc. v. Palmer Corp.*, 822 F. Supp. 496, 504 (N.D. Ill. 1993); *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, No. 94 C 50392, 1997 WL 811021, at *7 (N.D. Ill. Dec. 29, 1997); *Hengel*, 825 F. Supp. at 1320. The sales or offers underlying the alleged fraud occurred when Midlothian Ace entered into a franchise agreement with Ace on an unspecified date in 2002, (R. 21, Corrected Am. Compl. ¶ 13), when Arvada Ace entered into a franchise agreement with Ace on an unspecified date in 2005, (*id.* ¶ 15), and when Hometown Ace entered into a franchise agreement with Ace on an unspecified date in 2006, (*id.* ¶ 11). The three-year period following each of these transactions expired in 2005, 2008, and 2009, respectively. These three-year periods of repose expired before the spring of 2012, when the one-year limitations period expired, and thus govern the timeliness of Plaintiffs' IFDA claims. *See* 815 Ill. Comp. Stat. 705/27 (". . . whichever shall first expire . . ."). Consequently, Plaintiffs' claims based on section 6 of the IFDA are time-barred because this class action was filed on January 6, 2012, nearly six years after any of the Membership Agreements were signed. (*See* R. 1, Compl.)

Seeking to avoid this result, Plaintiffs argue that the IFDA limitations period is equitably tolled by Ace's fraudulent concealment. (R. 57, Pls.' Resp. at 18.) Plaintiffs also invoke the discovery rule, claiming that because Ace fraudulently concealed its unlawful conduct, Plaintiffs could not have discovered the fraud until the spring of 2011. (*Id.* at 20.) Plaintiffs thus argue that the IFDA limitations period did not begin to run until the spring of 2011. (*Id.*)

Plaintiffs refer to the three-year period set forth in the IFDA as a "statute of limitations." (*Id.* at 18.) A statute of limitations governs the time within which lawsuits may be brought after a cause of action has accrued. *Ferguson v. McKenzie*, 780 N.E.2d 660, 664 (Ill. 2001). A statute of limitations may be subject to the "discovery rule," which postpones the commencement of the limitations period until the injured party "knows or reasonably should know" that he has been

wrongfully injured. *Golla v. General Motors Corp.*, 657 N.E.2d 894, 898 (Ill. 1995). By contrast, a statute of repose extinguishes the action after a fixed period of time, regardless of the plaintiff's knowledge of his claim. *Ferguson*, 780 N.E.2d at 664 (a statute of repose is to "terminate the possibility of liability after a defined period of time, regardless of a potential plaintiff's lack of knowledge of his or her cause of action").

Contrary to Plaintiffs' position, the three-year period at issue here is a statute of repose under Illinois law. The language of the IFDA clearly specifies that the one-year period is one of limitations because it commences expressly upon plaintiff's discovery of his claim. 815 Ill. Comp. Stat. 705/27 (". . . after the franchisee becomes aware of facts or circumstances reasonably indicating that he may have a claim for relief . . ."). Equally clear is that the three-year period is a statute of repose because it commences upon the actions that constitute the IFDA violation. *Id.* (". . . after the act or transaction constituting the violation . . ."). A statute of repose does not incorporate the discovery rule as a basis for tolling the period of time in which a claim can be brought. *Wisniewski v. Diocese of Belleville*, 943 N.E.2d 43, 70 (Ill. App. Ct. 5th Dist. 2011); *Meyers v. Underwood*, 738 N.E.2d 118, 129 (Ill. App. Ct. 1st Dist. 2000) ("Statutes of repose generally operate to curtail the "long tail" of liability that results from the discovery rule . . . Without a statute of repose, such a statute of limitations would be essentially open-ended, or 'a limitation period without a limit.'" (quoting *Goodman v. Harbor Mkt., Ltd.*, 663 N.E.2d 13, 19 (Ill. App. Ct. 1st Dist. 1995))). Thus, Plaintiffs' argument that their IFDA claims are rendered timely by the application of the discovery rule is meritless.

Fraudulent concealment, however, can toll a statute of repose. *See DeLuna v. Burciaga*, 857 N.E.2d 229, 242-43 (Ill. 2006) (Illinois's statutory fraudulent concealment provision applies to both statutes of limitations and statutes of repose, even absent express legislative intent in the

statute of repose that tolling for fraudulent concealment should apply); *accord J.S. Reimer, Inc. v. Vill. of Orland Hills*, 990 N.E.2d 831, 842 (Ill. App. Ct. 1st Dist. 2013). When a defendant fraudulently conceals a cause of action from the plaintiff, the plaintiff may commence the action at any time within 5 years of discovery of the action. 735 Ill. Comp. Stat. 5/13-215. "The concealment contemplated by section 13-215 must consist of affirmative acts or representations calculated to lull or induce a claimant into delaying filing of his or her claim, or to prevent a claimant from discovering a claim." *Orlak v. Loyola Univ. Health Sys.*, 885 N.E.2d 999, 1009 (Ill. 2007). A plaintiff seeking to use fraudulent concealment to toll a limitations period must establish that the defendant made misrepresentations or performed acts which it knew to be false, with the intent to deceive the plaintiff, and that the plaintiff detrimentally relied on those representations or acts. *Id.* (citing *Foster v. Plaut*, 625 N.E.2d 198, 203 (Ill. App. Ct. 1st Dist. 1993)). When the plaintiff's substantive claim is fraud, the fraudulent conduct that forms the basis of that claim does *not* constitute fraudulent concealment absent a showing that the fraudulent conduct tended to deceive the plaintiff and prevent him from discovering his claim. *Foster*, 625 N.E.2d at 203. Furthermore, unless the defendant has fiduciary duties or obligations of confidence to the plaintiff, mere silence of the defendant and the failure of the plaintiff to discover his cause of action do not amount to fraudulent concealment. *Id.*; *J.S. Reimer*, 990 N.E.2d at 843.

Plaintiffs fail to allege any affirmative acts by Ace that were calculated to conceal the cause of action. Instead, Plaintiffs make vague allegations that Ace provided misleading "averages," manipulated sales projections, and "concealed and suppressed accurate data." (R. 21, Corrected Am. Compl. ¶¶ 83, 85.) Plaintiffs rely on the acts constituting the underlying claim of fraud to establish fraudulent concealment, and they emphasize Ace's silence. (*Id.* ¶¶ 83,

86.) In effect, Plaintiffs insist that Ace's alleged substantive fraud also constitutes fraudulent concealment.

To successfully claim fraudulent concealment without alleging affirmative acts to conceal a cause of action, Plaintiffs must establish that Ace's misrepresentations tended to conceal the fraud. *Orlak*, 885 N.E.2d at 1009. To do so, Plaintiffs must set forth specific facts in their complaint showing that either (1) they could not have discovered the fraud any sooner through the exercise of greater diligence; or (2) the trust and confidence they placed in Ace by virtue of their relationship prevented them from discovering the fraud any sooner. *Hagney v. Lopeman*, 590 N.E.2d 466, 469 (Ill. 1992). Plaintiffs make neither of these allegations in their complaint and instead only allude to Ace's persistent silence. (*See, e.g.*, R. 21, Corrected Am. Compl. ¶ 83) ("Ace failed to tell Vision 21 franchisees that the numbers were manipulated for the purpose of making the investment look reasonable.").

Plaintiffs also fail to allege facts showing that their relationship with Ace might, by its nature, prevent their discovery of the alleged fraud. Plaintiffs claim that "Ace was under a duty, pursuant to the Federal Trade Commission's Franchise Rule, to accurately inform its franchisees of the Vision 21 financial outlook and, if it provided any projections at all, to provide good faith predictions with reasonable bases." (*Id.* ¶ 84.) Plaintiffs do not claim that their franchisor-franchisee relationship is one of particular trust or confidence, and in fact, under Illinois law, parties to franchise agreements do not owe each other a fiduciary duty. *Oil Express Nat'l, Inc. v. Burgstone*, 958 F. Supp. 366, 370 (N.D. Ill. 1997) (citing *Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992)). The arm's-length contractual relationships between Plaintiffs and Ace are not confidential relationships merely because the parties owe to each other contractual duties. *See J.S. Reimer*, 990 N.E.2d at

843-44; *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996). Finally, even if relationships of trust and confidence existed between the parties, Plaintiffs do not allege that they placed any particular trust in Ace. *See Hagney*, 590 N.E.2d at 469. Consequently, Plaintiffs do not establish that they failed to discover the alleged fraud because of trust they placed in Ace. Plaintiffs thus fail to show that Ace's alleged fraud, on its own, tended to conceal the cause of action from Plaintiffs' discovery.

Because the discovery rule does not toll statutes of repose and Plaintiffs fail to allege the requirements to establish fraudulent concealment, the three-year statute of repose under the IFDA cannot be tolled. The Court thus dismisses as untimely Plaintiffs' claims of fraud under the IFDA (Count I).

### III. Timeliness of Plaintiffs' Common Law Fraud and Fraudulent Inducement Claims

Ace contends that Plaintiffs' common law claims of fraud and fraudulent inducement are time-barred under the relevant statutes of limitations. (R. 56, Def.'s Mem. at 11-13.) It argues that Plaintiffs' claims expired because the limitations period began to run after each Franchisee's first year of business, as soon as they discovered that their stores' sales did not match the projections that Ace provided. (*Id.*) This was in April 2008 for Putzier and Hometown Ace, (*id.* at 11), August 2003 for West and Midlothian Ace, (*id.* at 12), and March 2006 for Lorenz and Arvada Ace, (*id.* at 12-13). Plaintiffs argue that their fraud claims are timely under the tolling principles of fraudulent concealment and the discovery rule. (R. 57, Pls.' Resp. at 18-20.) They assert that the limitations periods did not begin to run until their collective discovery of Ace's fraudulent conduct in the spring of 2011. (*Id.* at 20.) The Court has already determined that Plaintiffs fail to establish fraudulent concealment as a defense against a limitations period. The

Court now examines whether the discovery rule provides relief from the statutes of limitations for Plaintiffs' common law claims.

Under Washington law, Putzier and Hometown Ace must have commenced their fraud and fraudulent inducement actions within three years of the alleged fraud. Wash. Rev. Code § 4.16.080(4). Under Texas law, West and Midlothian Ace had four years to make their claims. Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(4). In Colorado, Lorenz and Arvada Ace had three years. Colo. Rev. Stat. § 13-80-101(1)(c). All three states—Washington, Texas, and Colorado—allow for tolling of the limitations period by the discovery rule so that a fraud claim does not accrue until a plaintiff has discovered his claim. *Hudson v. Condon*, 6 P.3d 615, 620 (Wash. Ct. App. 2000); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455-56 (Tex. 1996); Colo. Rev. Stat. § 13-80-108(3). Because the discovery rule in each of these states is substantially similar, the Court examines the rules together to determine whether the limitations periods for Plaintiffs' claims were tolled.

The discovery rule tolls the statute of limitations for fraud until a plaintiff discovers or reasonably should have discovered that he has been injured and that his injury was likely caused by the wrongful acts of another. *See Hudson*, 6 P.3d at 620; *Computer Assocs. Int'l*, 918 S.W.2d at 456 (quoting *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)); *Trinity Broad. of Denver, Inc. v. City of Westminster*, 848 P.2d 916, 923 (Colo. 1993) (*en banc*). Even without actual knowledge, a plaintiff must exercise reasonable diligence to discover his claim once he has knowledge of information that would lead a reasonable person to inquire further. *See Allen v. State*, 826 P.2d 200, 203 (Wash. 1992) ("The discovery rule requires a plaintiff to use due diligence in discovering the basis for the cause of action."); *Seureau v. ExxonMobil Corp.*, 274 S.W.3d 206, 228 (Tex. App. 2008) (a plaintiff must have "sought information about his injuries

and their likely cause once apprised of facts that would prompt a reasonably diligent person to make an inquiry that would lead to discovery of the cause of action"); *Murry v. GuideOne Specialty Mut. Ins. Co.*, 194 P.3d 489, 492 (Colo. App. 2008) ("The point of accrual requires knowledge . . . 'of such information as would lead a reasonable person to inquire further.'" (quoting *Black's Law Dictionary* 888 (8th ed. 2004))).

Here, Plaintiffs contend that they did not have knowledge of Ace's alleged fraudulent conduct until sometime in the spring of 2011. (R. 21, Corrected Am. Compl. ¶ 87.) Assuming the truth of Plaintiffs' allegations, they may still be unable to use the discovery rule to toll the statute of limitations if, through the exercise of reasonable diligence, Plaintiffs could or should have discovered their claims prior to the spring of 2011. Whether a plaintiff has exercised due diligence for the purposes of the discovery rule is a question of fact unless reasonable minds could reach but one conclusion. *Allen*, 826 P.2d at 204; *Pirtle v. Kahn*, 177 S.W.3d 567, 572 (Tex. App. 2005); *Murry*, 194 P.3d at 491.

The Franchisees assert that each of their Ace stores began to experience some appreciable degree of financial injury in their first year of business. (R. 21, Corrected Am. Compl. ¶¶ 40, 58, 75.) The franchise stores continued to suffer financially every year they remained in operation. (*Id.* ¶¶ 40, 58, 75.) One of the stores closed as a result of financial problems. (*Id.* ¶ 59.) The Franchisees knew that their stores were not performing in a manner consistent with the forecasts provided in Ace's pro forma documents. (*Id.* ¶¶ 34, 52, 69.)

Drawing all reasonable inferences in Plaintiffs' favor, the Court cannot conclude that the franchise stores' failure to perform at projected levels in their first years of business should have prompted Plaintiffs to inquire into Ace's potential wrongdoing. Ace's argument implies that Plaintiffs could have preserved their suit only by suspecting that they had been defrauded at the

first sign of financial trouble. The Court's adoption of this position would require franchisees to engage in speculative litigation based solely upon poor economic performance—a reality of business that occurs often due to natural market forces. Attributing Plaintiffs' failure to have immediately suspected fraud when faced with struggling franchise stores to a lack of diligence is not the only reasonable conclusion that could be made. Instead, Plaintiffs' complaint raises a question of fact as to whether, at some point between the first year of business and spring 2011, Plaintiffs had the type of knowledge that would prompt a reasonable person to inquire into potential wrongdoing on Ace's part. *See Allen*, 826 P.2d at 204; *Pirtle*, 177 S.W.3d at 572; *Murry*, 194 P.3d at 491. For now, the Court accepts as true Plaintiffs' allegations that they did not have knowledge of facts lending to Ace's alleged wrongful conduct until spring 2011.

For the purposes of this motion to dismiss, therefore, the discovery rule tolled the statutes of limitations for Plaintiffs' claims of fraudulent inducement and fraud until sometime in the spring of 2011. Although Plaintiffs do not indicate the precise date when they became aware of their causes of action for fraudulent inducement and fraud, the gap between the spring of 2011 and January 6, 2012, when this action was filed, is less than a year and is well within Washington's and Colorado's three-year and Texas's four-year statutes of limitations. The Court thus declines to dismiss this action as time-barred.

## IV.    Lorenz's and Arvada Ace's Standing

Ace argues that Lorenz and Arvada Ace have no standing to bring this action. Lorenz filed for Chapter 7 bankruptcy protection on September 22, 2010, in the United States Bankruptcy Court for the District of Colorado. (R. 56, Def.'s Mem. at 19; R. 57, Pls.' Resp. at 20-21.) Lorenz did not schedule any claim against Ace as an asset in his bankruptcy petition, and the bankruptcy trustee administered no such claim. (*See* R. 57, Pls.' Resp. at 21.) Ace

contends that the claims Lorenz now seeks to bring "remain the property of the bankruptcy estate, and neither Mr. Lorenz nor [Arvada Ace] has standing to pursue such claims in their own names." (R. 56, Def.'s Mem. at 19-20.)

Whether a plaintiff has standing presents a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing that standing exists. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Lee v. City of Chi.*, 330 F.3d 456, 468 (7th Cir. 2003). In addition to constitutional standing requirements set forth in *Lujan*, the Court must consider prudential limitations, which are "closely related to Art[icle] III concerns but essentially matters of judicial self-governance." *Warth*, 422 U.S. at 500. One well-established limitation on a federal court's power to entertain suits is that a litigant cannot sue to enforce the rights of a third party. *Id.* at 499; *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008). This prudential concern is codified in Federal Rule of Civil Procedure 17(a), which provides that "an action must be prosecuted in the name of the real party in interest." *RK Co. v. See*, 622 F.3d 846, 850-51 (7th Cir. 2010) (quoting Fed. R. Civ. P. 17(a)). "The 'real party in interest' is the person who possesses the right or interest to be enforced through litigation." *Id.*

Ace's argument that this action belongs to Lorenz's bankruptcy estate presents a prudential question of who is the "real party in interest" under Rule 17(a). *See, e.g., Lee v. Deloitte & Touche LLP*, 428 F. Supp. 2d 825, 830-31 (N.D. Ill. 2006) (Plaintiff's Chapter 7 bankruptcy proceedings invoked prudential considerations under Rule 17(a)); *Tate v. Snap-On Tools Corp.*, No. 90 C 4436, 1997 WL 106275, at *4 (N.D. Ill. Feb. 11, 1997) (ability of bankruptcy trustee to substitute as plaintiff hinged on the Rule 17(a) real-party-in-interest

doctrine rather than a jurisdictional question of standing). The issue arises here because the alleged fraudulent transaction upon which Lorenz bases his claims—the purchase of his franchise and signing of his Membership Agreement—occurred prior to his filing for bankruptcy in 2010. (*See* R. 21, Corrected Am. Compl. ¶¶ 60-68.) Filing a Chapter 7 bankruptcy petition creates a bankruptcy estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "[V]irtually all property of the debtor" at the time he files for bankruptcy—including any causes of action—becomes property of the bankruptcy estate. *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993); *see also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983) ("Congress intended a broad range of property to be included in the estate"). The trustee appointed in Chapter 7 bankruptcy alone has authority to administer and dispose of property within the bankruptcy estate. *See* 11 U.S.C. §§ 541(a)(1), 704(1); *Cable v. Ivy Tech State Coll.*, 200 F.3d 467, 472 (7th Cir. 1999), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). This exclusive authority includes the right to pursue the debtor's pre-petition causes of action. *Cable*, 200 F.3d at 472; *In re Enyedi*, 371 B.R. 327, 332-33 (Bankr. N.D. Ill. 2007). Property a debtor acquires post-petition, however, belongs to the debtor. *In re Holstein*, 321 B.R. 229, 235 (Bankr. N.D. Ill. 2005); *In re Hedged-Invs. Assocs., Inc.*, 84 F.3d 1281, 1285 (10th Cir. 1996).

"For the purpose of § 541 of the Bankruptcy Code, a claim or cause of action has accrued when all of the 'elements of the cause of action had occurred as of the time the bankruptcy case was commenced, so that the claim is sufficiently rooted in the debtor's prebankruptcy past.'" *Paul v. USIS Commercial Servs., Inc.*, No. 04 RB 1384 CBS, 2006 WL 2385202, at *2 (D. Colo. Aug. 17, 2006) (quoting *In re Alipour*, 252 B.R. 230, 235 (Bankr. M.D. Fla. 2000)); *Segal v. Rochelle*, 382 U.S. 375, 380 (1966). In Colorado, the elements of fraud necessary to bring a

claim are: (1) a false statement of material fact; (2) the defendant's knowledge of its falsity; (3) the plaintiff's ignorance of its falsity; (4) the defendant's intent that the plaintiff rely on that statement; and (5) the plaintiff's resulting damages. *Brody v. Bock*, 897 P.2d 769, 775-76 (Colo. 1995). The facts giving rise to a fraudulent inducement claim are the defendant's misrepresentation of a material fact and the plaintiff's justifiable reliance on that misrepresentation, resulting in damage to the plaintiff. *J.A. Walker Co. v. Cambria Corp.*, 159 P.3d 126, 132 (Colo. 2007).

Lorenz first contacted Ace in 2003. (R. 21, Corrected Am. Compl. ¶ 60.) Lorenz alleges that Ace made knowingly false statements and misrepresentations of material facts when it provided Lorenz with financial data and draft pro formas prior to the signing of his franchise agreement in 2005. (*Id.* ¶¶ 61-64.) Lorenz asserts that Ace intended him to rely and that he actually did rely on this information in deciding to join Ace's franchise system in 2005. (*Id.* ¶¶ 108, 114.) Lorenz first suffered financial injury during Arvada Ace's first year of business, (*id.* ¶ 75), at which time "all of the elements of the cause of action had occurred" and thus his cause of action accrued for the purposes of section 541 of the Bankruptcy Code, *Paul*, 2006 WL 2385202, at *2 (internal quotation marks omitted); *see also Gabelli v. S.E.C.*, 133 S. Ct. 1216, 1220 (2013) ("the 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action'" (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007))). In light of these dates and the fact that Lorenz did not file for bankruptcy until September 2010, the Court concludes that Lorenz's and Arvada Ace's claims are sufficiently rooted in the prebankruptcy past that they are the property of the bankruptcy estate.

Seeking to avoid this result, Lorenz argues that his fraud claims belong to him rather than his bankruptcy estate because, due to Ace's fraudulent concealment, he was not aware of his

cause of action until the spring of 2011, after the close of his bankruptcy case. (R. 57, Pls.'
Resp. at 20-21.) But a debtor's actual knowledge of a claim is irrelevant to whether he had a
property interest at the time of bankruptcy. *See Polis*, 217 F.3d at 902 (even though debtor did
not bring her Truth in Lending Act and consumer protection claims until after filing for
bankruptcy, the claims arose out of a transaction that occurred before bankruptcy and thus were
property of her bankruptcy estate); *In re Macri*, No. 06 C 4441, 2007 WL 1958576, at *2 (N.D.
Ill. June 29, 2007) ("[w]hether aware of his injury or not," plaintiff's claim arose prior to
bankruptcy and thus belonged to bankruptcy trustee); *In re Saunders*, No. 94-23489-BKC-RBR,
2003 WL 23239155, at *4 (Bankr. S.D. Fla. Dec. 10, 2003) ("[E]ven though the state statute of
limitations governing how long the plaintiff has to institute a malpractice action may not have
begun, a debtor may have a property interest."). A plaintiff's discovery of his cause of action,
while potentially relevant to a statute of limitations analysis, does not affect the accrual of his
claim for determining the nature of the bankruptcy estate. *In re Macri*, 2007 WL 1958576, at *2;
*In re Swift*, 129 F.3d 792, 796 (5th Cir. 1997); *In re Tomaiolo*, 205 B.R. 10, 15 (Bankr. D. Mass.
1997). Regardless of Lorenz's ignorance of his claim, his interest in this cause of action against
Ace remains with the bankruptcy estate. The bankruptcy trustee, rather than Lorenz or Arvada
Ace, is the real party in interest under Rule 17(a), and only the bankruptcy trustee appointed to
Lorenz's Chapter 7 case is entitled to bring these claims.

The remaining question is whether the Court should dismiss Lorenz's and Arvada Ace's
claims due to their lack of prudential standing. Plaintiffs argue that, pursuant to Rule 17(a)(3),
the Court should grant time for the bankruptcy trustee appointed to Lorenz's case to consider
whether to pursue this claim on behalf of the bankruptcy estate. (R. 57, Pls.' Resp. at 21.) Rule
17(a)(3) provides that "[t]he court may not dismiss an action for failure to prosecute in the name

of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). Ace argues that the application of Rule 17(a)(3) is inappropriate here because it only applies in cases where the "determination of the proper party to use is difficult or an understandable mistake has been made." (R. 58, Def.'s Reply at 13) (citing Fed. R. Civ. P. 17 adv. comm. notes (1966)).

A primary function of Rule 17(a)(3) is to permit inclusion of the real party in interest in order to protect the defendant against subsequent suits and to preserve the effect of res judicata. Fed. R. Civ. P. 17 adv. comm. notes (1966); *Thomas D. Philipsborn Irrevocable Ins. Trust v. Avon Capital, LLC*, No. 11 C 3274, 2013 WL 6068797, at *3 (N.D. Ill. Nov. 18, 2013); *see also Nagle v. Comm. Credit Bus. Loans, Inc.*, 102 F.R.D. 27, 31 (E.D. Pa. 1983). This permits the court to resolve the dispute in a single action, ensures that the judgment will have proper res judicata effect, and protects the defendant against subsequent actions. *Thomas D. Philipsborn Irrevocable Ins. Trust*, 2013 WL 6068797, at *3. At the same time, Rule 17(a)(3) is designed to prevent forfeiture and allow substitution of the real party in interest when necessary to avoid injustice. *Id.*; *Tate*, 1997 WL 106275, at *8 (N.D. Ill. Feb. 11, 1997) (citing 6A Wright & Miller, *Fed. Practice & Procedure*, § 1555, at 415; *Nagle*, 102 F.R.D. at 32). Although the Seventh Circuit has not addressed this issue, courts in this District and in other circuits have tended to allow for substitution by a trustee in the context of bankruptcy. In *Tate v. Snap-On Tools Corp.*, for example, the plaintiff only notified his estate's trustee of the claim after an "embarrassing delay," but the court allowed the trustee to substitute into the proceedings in order to prevent forfeiture. 1997 WL 106275, at *8. The court noted that it would be unjust to deny the trustee recovery where his failure to pursue the fraud claim was not his own fault and the defendant

gave no evidence that it would be prejudiced by the substitution. *Id.* In *In re Olson*, the district court reversed a bankruptcy court's outright dismissal of a title company's case on the basis of Rule 17(a)(3). No. 93 C 4489, 1995 WL 348038, at *4 (N.D. Ill. May 30, 1995). The decision to dismiss was "clearly erroneous" because the district court failed to give the plaintiff an opportunity to determine the proper real party in interest and petition for its substitution. *Id.* at *3-*4; *see also Wieburg v. GTE Sw. Inc.*, 272 F.3d 302, 309 (5th Cir. 2001) (emphasizing the importance of preventing forfeiture under Rule 17(a) and noting that a court must consider whether a dismissal will deprive creditors of a bankruptcy estate of any possibility of recovery); *Sun Refining & Mktg. Co. v. Goldstein Oil Co.*, 801 F.2d 343, 345 (8th Cir. 1986) (holding that absent prejudice to the defendant, it was unjust to deny an opportunity for ratification when dismissal would result in forfeiture by the real party in interest).

The trustee appointed in Lorenz's bankruptcy case was not notified of this action until recently. (*See* R. 57, Pls.' Resp. at 22.) It would be unjust to prevent the trustee from pursuing the fraud claim where his failure to do so earlier was not the result of his own inaction, but of his inability to have discovered the claim. This result would prejudice the trustee and the creditors of the bankruptcy estate by denying them any chance at recovery. By contrast, Ace presents no argument that it would be prejudiced by the substitution. Thus, in light of the aims of Rule 17(a)(3), the Court finds it appropriate to entertain the trustee's substitution for Lorenz and Arvada Ace in the present proceedings. *See Burruss v. Cook Cnty. Sheriff's Office*, No. 08 C 6621, 2013 WL 3754006, at *18 (N.D. Ill. July 15, 2013) ("[B]ecause [plaintiffs] failed to disclose their interest in this suit during their bankruptcy proceedings, they personally may not benefit from the verdict in this case. Their interests in this suit now belong to their bankruptcy estates, so the most appropriate result is to permit those estates to intervene and seek recovery

here.") Although the Court grants Ace's motion to dismiss the complaint, Lorenz's and Arvada Ace are granted leave to move to substitute the bankruptcy trustee as a party to any amended complaint Plaintiffs may file. If the trustee does not seek to substitute into this action or ratify Lorenz's and Arvada Ace's claims, those claims will be dismissed.

## V. Sufficiency of the Pleadings under Rule 9(b) and Rule 12(b)(6)

Ace moves to dismiss Counts II and III for failure to state a claim and for failure to plead with the specificity required by Rule 9(b). (R. 56, Def.'s Mem. at 7, 13.) Count II of Plaintiffs' amended complaint asserts fraudulent inducement, and Count III alleges common law fraud. (R. 21, Corrected Am. Compl. at 22-23.) Both counts sound in fraud, so they both must satisfy Rule 9(b) pleading requirements. *Pirelli*, 631 F.3d at 441; *Ackerman*, 172 F.3d at 470. A claim that sounds in fraud must state the circumstances constituting the fraud "with particularity." Fed. R. Civ. P. 9(b). "This ordinarily requires describing the "who, what, when, where, and how" of the fraud." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citing *Pirelli*, 631 F.3d at 441-42). Ace contends that Plaintiffs' complaint fails on the basis of Rule 9(b) because it omits, *inter alia*: the source, content, and misleading nature of information Franchisees received; the identity of the "many documents" Plaintiffs allege supplied false information to Franchisees; the specific fraudulent content within the documents or within Ace's statements; the identities of the individuals who delivered the alleged false representations to the Franchisees; and when each Franchisee received the information pertaining to his Ace store. (R. 56, Def.'s Mem. at 7-9.) Because a common set of facts forms the basis of both counts, the Court will address the sufficiency of Counts II and III of Plaintiffs' complaint simultaneously.

Plaintiffs allege that Ace "had a uniform policy and practice . . . of providing misleading information to potential . . . franchisees in two ways." (R. 21, Corrected Am. Compl. ¶ 2.) First,

Plaintiffs allege that the purported "averages" listed in the UFOCs "were not averages of all Vision 21 stores, or even all reporting stores, but rather, consisted of cherry-picked succeeding stores or those from high growth areas." (*Id.*) Second, Plaintiffs allege that "Ace uniformly represented that Vision 21 stores would generate positive cash flows in their first years of operation," and that those projections were derived from "tested and proven methods of analyzing data reflecting past performance" and were over 90% accurate. (*Id.* ¶ 3.) Plaintiffs claim that Ace manipulated data, however, to "create[ ] a false picture of anticipated success," (*id.*), and that Ace knew "that the franchises could never perform at a level anywhere near those projections" and "would, in all likelihood, fail," (*id.* ¶ 6). Plaintiffs further allege that they decided to purchase franchises in reliance of "Ace's material misrepresentations and omissions." (*Id.* ¶ 5.)

The complaint is vague about critical information such as which representations were written or spoken, whether they were advertised by the corporation or communicated by an individual, whether they were stated on a single instance or as part of ongoing communications with the Plaintiffs, or even whether the representations were made to each Plaintiff. "Rule 9(b) requires particular references to specific alleged fraudulent activities." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 949 (7th Cir. 2013). The only remotely particular facts alleged in the complaint are that: the Franchisees received "many documents" from Ace showing that "existing Ace stores had positive sales numbers and were largely successful," (R. 21, Corrected Am. Compl. ¶¶ 26, 46, 62); in or around 2006, Stace Heston, Ace's Market Development Manager, told Putzier that he would be a successful franchisee, (*id.* ¶ 23); Ace provided Putzier with a draft pro forma predicting his sales in the first two years, that his business would be sustainably profitable after the third year and cash flow positive after the fourth, and that he would recapture

his cash investment within the first seven years; (*id.* ¶¶ 28, 32); in or around 2002, Tom Knox, an Ace employee, provided West with a draft pro forma showing that his store would be sustainably profitable and that he would recapture his investment within the first three to five years, (*id.* ¶¶ 48, 50); in or around 2003, Gary Johnson, one of Ace's Market Development Managers, told Lorenz that he could only recall one Vision 21 store failing, (*id.* ¶ 61); and Ace provided Lorenz with a draft pro forma showing that his store would make around $1 million in sales its first year and would be sustainably profitable, (*id.* ¶¶ 64, 75).

These allegations, while they include some details, are not sufficiently particular to meet the heightened pleading requirements of Rule 9(b). *See, e.g., H.C. Duke & Son, LLC v. Prism Mktg. Corp.*, No. 411CV04006SLDJAG, 2013 WL 5460209, at *3 (C.D. Ill. Sept. 30, 2013) (Allegations that equipment supplier's "'representatives' with making misrepresentations in '2009, 2010 and/or the first month of 2011'" included an "overly broad 25-month time range" and did not "sufficiently establish the identity of the person making the alleged misrepresentation," and also omitted "any place, particular mode of communication, or other specific details regarding the alleged fraudulent communications," and "thus lack[ed] the specificity mandated by Rule 9(b)." (citing *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 778 (7th Cir. 1994))); *Window World of Chicagoland, LLC v. Window World, Inc.*, No. 12 C 579, 2012 WL 1886467, at *3 (N.D. Ill. May 23, 2012) ("[T]he complaint alleges only that these defendants 'repeatedly' represented that Window World would protect plaintiffs' territories with buffer areas and would enforce the Window World trademark, and that plaintiffs would make $120,000 in net profit. However, plaintiffs fail to specify the times and places of these representations, and the method by which defendants communicated them. The court finds that the allegations of fraud do not satisfy Rule 9(b)."). For example, Plaintiffs contend that the

"representations, averages, and ranges contained in the UFOC were misleading, because Ace . . . included an 'average' of only successful stores," (R. 21, Corrected Am. Compl ¶ 27), but Plaintiffs fail to specify the content of those misrepresentations. Although Ace only attached portions of the UFOCs to its motion, the UFOCs distributed by Ace appear to be at least 74 pages in length. (R. 56-1, Ex. A, UFOC.) The 16 attached pages are replete with tables and explanatory paragraphs showing data over a range of fiscal years via several distinct measures of performance. (*Id.*) Plaintiffs do not specify which of the representations they find misleading, which variable numbers were allegedly inflated, which tables are relevant to their claim, or which information the Franchisees allegedly relied upon to their detriment. The excerpt of the UFOC attached to Ace's motion states that the statistics are derived from fiscal years 2003, 2004, and 2005. (*Id.*) Plaintiffs do not indicate, however, whether the UFOC West received when he signed a franchise agreement in 2002 were the same as or similar to the UFOC Putzier received when he agreed to franchise in 2006. Similarly, Plaintiffs allege that Ace provided the Franchisees with "information and forecasts predicting sales," (*e.g.*, *id.* ¶ 25), yet they omit the details such as who provided these forecasts or when they were communicated to the Franchisees. Instead of pleading the fraud claims with the particularity required by Rule 9(b), the complaint consists mostly of sweeping allegations. (*See, e.g.*, *id.* ¶ 85 (alleging that "Ace intentionally concealed and suppressed accurate data and concealed and suppressed the unreliable and fraudulent methods which it used to provide projections").) In sum, Plaintiffs fail to demonstrate that they "[did] their homework" by conducting sufficient pre-complaint inquiry "to assure that the charge of fraud is responsible and supported." *See Pirelli*, 631 F.3d at 439; *Ackerman*, 172 F.3d at 469.

Plaintiffs argue that they cannot plead more specifically because many of the specific facts about Ace's misrepresentations remain within Ace's knowledge or control and that their complaint gives Ace "more than enough information from which it can meaningfully respond." (R. 57, Pls.' Resp. at 8.) "The purpose of requiring that fraud be pleaded with particularity is not . . . to give the defendant in such a case enough information to prepare his defense. A charge of fraud is no more opaque than any other charge." *Ackerman*, 172 F.3d at 469. Instead, the purpose "of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint." *Id.* The specificity requirements may be relaxed "when the details are within the defendant's exclusive knowledge." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) (citing *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1567 n.7 (7th Cir. 1991)); *see also Gandhi v. Sitara Capital Mgmt., LLC*, 721 F.3d 865, 870 (7th Cir. 2013) ("The degree of particularity required will necessarily vary depending on the circumstances under which the plaintiff filed its complaint."). Under those circumstances, however, the complaint must provide the plaintiff's grounds for suspicion of fraud. *Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013) (citing *Pirelli*, 631 F.3d at 443). "The grounds for plaintiff's suspicions must make the allegations *plausible*, even as courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail." *Pirelli*, 631 F.3d at 443.

Here, the only supporting facts Plaintiffs allege seem to be the failures of their respective stores to meet Ace's sales projections. (*See* R. 21, Corrected Am. Compl. ¶¶ 40, 58.) These allegations are not sufficient to meet even the relaxed standards of Rule 9(b), and they do not excuse Plaintiff from pleading the content of the allegedly fraudulent representations on which they relied. Although an information asymmetry may exist here, Ace does not have exclusive

control over the information upon which Plaintiffs base their fraud claims because that information was provided to Plaintiffs in the UFOCs, the pro formas, and the "many documents" Plaintiffs received from Ace. (*See id.* ¶¶ 46, 62.) Even when a plaintiff has limited information, the court still expects him to attempt to describe the "who, what, when, where, and how" of the fraud. *Beyrer*, 722 F.3d at 949 (7th Cir. 2013.) Plaintiffs' complaint lacks information about the content of the alleged misrepresentations that form the basis of their claims and information about the transmission of those misrepresentations; it thus fails to set forth facts that "assure the charge of fraud is responsible and supported." *See Ackerman*, 172 F.3d at 469.

Because the Court finds that Plaintiffs have failed to meet the heightened pleading requirements imposed by Rule 9(b), the complaint must be dismissed. Plaintiffs request leave to amend their complaint if the Court so finds. (R. 57, Pls.' Resp. at 9.) Generally speaking, leave to amend should be granted at least once when there is a potentially curable problem with the complaint. *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). The Rules of Civil Procedure instruct that the Court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). In the interest of justice, the Court will allow Plaintiffs the opportunity to amend their complaint to correct the deficiencies that have resulted in this dismissal.

**CONCLUSION**

For the foregoing reasons, Ace's motion to dismiss (R. 55) is GRANTED. Plaintiffs' IFDA claim in Count I is dismissed as untimely pursuant to 815 Ill. Comp. Stat. 705/27. Plaintiffs' fraud and fraudulent inducement claims in Counts II and III are dismissed without prejudice for want of particularity pursuant to Rule 9(b). Plaintiffs are granted leave to amend and reinstate their claims in Counts II and III, provided they are able to plead with sufficient specificity to meet the heightened pleading standard for fraud claims imposed by Rule 9(b). Plaintiffs may file a Second Amended Complaint, consistent with this Opinion, on or before August 1, 2014.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

Dated: June 25, 2014